UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| ANDREW BANKS, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:15-cv-00400-SLC |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, *sued as Nancy A. Berryhill, Acting Commissioner of Social Security Administration,*[1] | ) ) ) ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Andrew Banks appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[2] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Banks applied for DIB and SSI in November 2012, alleging disability in December 2010. (DE 10 Administrative Record ("AR") 226-33, 258-59). The Commissioner denied Banks's application initially and upon reconsideration. (AR 147-50, 156-59). After a timely request, a

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, — F.3d —, 2017 WL 398309 (7th Cir. Jan. 30, 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

hearing was held on May 29, 2014, before Administrative Law Judge Maryann S. Bright ("the ALJ"), at which Banks, who was represented by counsel, and a vocational expert, Amy Kutschbach (the "VE"), testified. (AR 32-87). On August 29, 2014, the ALJ rendered an unfavorable decision to Banks, concluding that he was not disabled because he was capable of performing a significant number of jobs in the economy despite the limitations caused by his impairments. (AR 12-26). The Appeals Council denied Banks's request for review (AR 1-4), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Banks filed a complaint with this Court on December 28, 2015, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Banks argues that the ALJ: (1) failed to develop the record as to his current functioning, and (2) improperly discounted the credibility of his symptom testimony. (DE 15 at 18-25).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Banks was 42 years old (AR 26, 226); had a tenth grade education (AR 42, 263, 373) with special education classes (AR 42-43, 325); and had past relevant work experience as a foundry worker (AR 264, 323).

### A. *Banks's Testimony at the Hearing*

At the hearing, Banks testified that he is single and has two children, ages 22 and 14. (AR 37). He lives with his mother and grandmother; his mother takes care of all the household tasks, so he does not do much around the house. (AR 37-40). Banks had been denied Medicaid but was appealing that decision; he was receiving food stamps. (AR 41). His license had been

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 412-page administrative record necessary to the decision.

suspended due to falling behind in child support payments, and a female friend drives him places. (AR 41-42). He does not go to the store, fearing people might bump into him and cause him to fall. (AR 44-45). He is independent with his self care. (AR 70-71).

When asked why he thought he could not work, Banks cited his auto accident in 2010, explaining that he could no longer run, jump, or stand for very long. (AR 54-55, 60). When he sits, he feels needles in his left leg, so he props his leg up. (AR 55, 64). He states that his left leg swells when he stands or walks too long, so he spends most of the day with his leg propped up. (AR 59-60, 64, 77). Elevating his left leg reduces the swelling and feeling of needles but does not eliminate it. (AR 78). He uses a cane all the time. (AR 65-67). He asserted that he is in constant pain every day. (AR 56, 64). He was not, however, taking any medication for his symptoms other than what he obtained by visiting an emergency room. (AR 58-60). Banks stated that a doctor had recently recommended that the hardware be removed from his left leg, but he could not afford the surgery. (AR 73). He also complained of shoulder pain. (AR 55-56). Additionally, Banks claimed that he could not work because his past car accident is always on his mind, causing him to "freak[] out." (AR 67). When asked if he had consulted anyone about these thoughts, Banks stated that he could not afford to do so. (AR 68).

The ALJ also asked Banks about his education, noting that he had attended school through the tenth grade. (AR 42). Banks responded that he was "in the slow class learning," "couldn't learn for nothing," and "couldn't read." (AR 42). The ALJ then further inquired:

Q Okay. Now, can you read?

A No. I cannot. I'm not that good of a reader.

Q Okay. Small words?

> A Yeah.
>
> Q What about a newspaper?
>
> A No, I can't.
>
> Q No even the captions or - -
>
> A No. I can't. Can't even write.
>
> Q You can't write anything?
>
> A I can write my name.
>
> Q Okay. What about a grocery list? Can you read or write one of those?
>
> A No. No, I cannot.

(AR 43). The ALJ then asked Banks whether he had completed the disability application, observing that he had signed it as if he had. (AR 43-44). Banks denied completing it, stating that a friend had helped him and that he maybe had "signed the wrong thing." (AR 44). The ALJ further noted that on a third party function report, Banks's friend indicated that Banks reads books and magazines. (AR 69; *see* AR 290-91). Banks explained that he looks at catalogs and magazines but cannot read them, stating: "I'm not a reader. I'm not a good reader. I'm not. I mean, that's kind of embarass[ing] to say, but I'm not. That is it." (AR 70).

*B. Banks's Educational History*

In November 1984, Banks, who was 13 years old at the time, scored "66-73-68 PS" on the Weschler Intelligence Scores for Children, Revised (WISC-R). (AR 325). Subsequent to this testing, Banks was enrolled in the mild mentally handicapped program at Fort Wayne Community Schools Department of Special Education. (AR 325). Banks retook the WISC-R in July 1987, scoring "54-58-52 ND." (AR 325). He reports a history of learning difficulties and

4

special education classes, and he left school in the tenth grade. (AR 378).

## C. *Summary of the Relevant Medical Evidence*

On October 30, 2009, Banks was involved in a motor vehicle collision, sustaining a left calcaneus fracture and a large de-gloving of his left lower extremity. (AR 342). Banks underwent six surgeries on his left leg and was hospitalized for three weeks. (AR 328, 330, 332, 336).

On November 30, 2009, Banks visited Dr. David Goertzen at Ortho Northeast for follow-up care. (AR 362). Banks reported intermittent dull pain in his left leg, rating it as a "four" on a 10-point scale. (AR 362). Dr. Goertzen found that Banks's wounds were healing nicely and that the hardware was in good position. (AR 362). He instructed Banks to remain non weight-bearing, to work on his left ankle range of motion, and to perform seated work for at least six weeks. (AR 362).

Banks returned to Dr. Goertzen in December 2009. (AR 358-60). He was using assistive devices to ambulate and exhibited limited range of motion in his left lower extremity; he rated his pain as a "two." (AR 359-61). Dr. Goertzen pulled the K-wires from Banks's left leg and instructed him to remain non weight-bearing and to stay off work for three more months. (AR 360). In January 2010, Dr. Goertzen allowed Banks to be weight-bearing as tolerated, but to stay off work for another six weeks if his employer would not allow him to perform seated work. (AR 359).

In March 2010, Banks told Dr. Goertzen that he was experiencing dull pain at a level "eight" all the time. (AR 357). Dr. Goertzen observed that Banks's ankle was fairly tight. (AR 357). Dr. Goertzen recommended that Banks perform daily activity as tolerated, work on range

5

of motion, and return to regular duties in April 2010. (AR 357). When Banks returned to Dr. Goertzen in April, he reported a sharp, burning, throbbing pain in his left ankle that occurred intermittently and when walking. (AR 356). Dr. Goertzen observed that Banks was doing well and recommended that he continue to be weight-bearing, to perform activities, and to work, as tolerated. (AR 356). Dr. Goertzen referred Banks to physical therapy for work conditioning and work hardening and recommended that he ride an exercise bike. (AR 356).

In April 2010, Banks underwent an initial physical therapy evaluation. (AR 349). He was employed as a machine operator/truck driver at the time, working eight to 12 hour shifts. (AR 349). Banks reported pain in his left ankle, which increased with standing, walking, or going up or down stairs. (AR 349). The physical therapist observed mild edema in Banks's left ankle with increased pain upon palpation. (AR 349). Banks stood with less weight on his left leg, and he ambulated slowly with reduced left ankle plantarflexion and dorsiflexion. (AR 349). Banks demonstrated reduced active range of motion, and manual muscle testing was 2/5 for all left ankle movements. (AR 349). Dr. Goertzen recommended that Banks continue physical therapy. (AR 349).

In May 2010, Banks told Dr. Goertzen that he was experiencing sharp pain at a level "seven" or "eight," both intermittently and with activity. (AR 354). Banks's gait was antalgic, demonstrating limited range of motion in his left leg. (AR 354). Dr. Goertzen recommended that he continue physical therapy and be weight-bearing as tolerated, and further instructed him to stand for three hours of his eight-hour shift and to increase his amount of standing each week. (AR 354). In June, Banks still complained of pain. (AR 353). Dr. Goertzen observed swelling in Banks's left leg. (AR 353). Dr. Goertzen kept Banks off work for another month, with

6

weight-bearing and activity as tolerated. (AR 353). In August 2010, Banks reported that he was no longer in pain. (AR 352). Dr. Goertzen found that Banks's condition had significantly improved and was stable; Dr. Goertzen instructed him to be weight-bearing as tolerated. (AR 352).

Almost a year and a half later, in January 2012, Banks re-injured his ankle while pushing a car. (AR 350). He was seen by a physician's assistant at Ortho Northeast, presenting with pain, swelling, tenderness, tingling, and stiffness in his left ankle. (AR 350-51). He rated his sharp, throbbing pain as a "10," stating that it worsened with activity and improved with rest. (AR 350). Upon examination, Banks had tenderness and bruising in his left ankle; he also had limited movement from his previous injury. (AR 350). He was diagnosed with status post open reduction internal fixation ("ORIF") left fibula fracture as well as a new soft tissue injury. (AR 350). He was instructed to wrap his ankle, to remain non weight-bearing, and to follow up with Dr. Goertzen. (AR 350).

In July 2012, Banks went to the emergency room after being hit by a bottle on the left side of his face two days earlier. (AR 368). He reported pain, headache, lightheadedness, blurred vision, and nausea; he had bruising, inflammation, and hematoma to the left periorbital area. (AR 395, 397). A head CT scan showed fractures to the left maxillary sinus and left orbital wall. (AR 367-68). He was prescribed antibiotics and pain medication. (AR 398).

In January 2013, Banks visited a nurse practitioner at the Matthew 25 Clinic for chronic left leg and foot pain and blurred vision in his left eye. (AR 365-66). On exam, Banks's left lower leg was tender, had edema, and had reduced sensation. (AR 365). He was prescribed a trial of mobic for his pain and was referred for further evaluation of his left eye. (AR 366).

7

Also in January 2013, Dr. H.M. Bacchus, Jr., performed a consultative physical examination at the request of the state agency. (AR 373-76). Dr. Bacchus found that Banks's gait was antalgic with partial weight-bearing on his left lower extremity; he was unable to perform heel-toe gait, hop on his left, or tandem walk. (AR 374). His gait was slow with poor to fair sustainability. (AR 374). Dr. Bacchus found that Banks was unable to ambulate without the cane due to an inability to place full weight on his left leg. (AR 374). Banks exhibited hypersensitivity to touch on his left ankle, atrophy in his left calf, and reduced range of motion in his knees and left ankle. (AR 374-75). Dr. Bacchus diagnosed Banks with: (1) history of motor vehicle accident with significant crushing injuries to his left lower extremity; status post multiple reconstructive surgeries with skin grafts, muscle flap transfer, and left ankle ORIF; and (2) weak, antalgic gait with partial left lower leg weight-bearing with cane use 100% of time. (AR 374). Dr. Bacchus noted that in light of his residual left leg and ankle weakness, pain, decreased range of motion, and hyperesthesia, Banks had significant left lower extremity limitations but nevertheless could perform "light duties, mainly sit-down in nature with 1-2 hours non-continuous standing in a 6-8 hour day, and avoid squatting, climbing, or walking on uneven ground." (AR 374).

In March 2013, Dr. Goertzen penned a letter to the state agency indicating that he thought Banks could ambulate and carry 10 pounds, and if he needed a cane, it would only be intermittently for ambulation, not for standing. (AR 377).

Also in March 2013, Banks underwent a consultative psychological examination by Andrew Miller, Psy.D., at the request of the state agency. (AR 378-81). Dr. Miller found that Banks exhibited symptoms of an anxiety disorder, including nightmares about his accident, and

8

an adjustment disorder due to his leg injury, in the form of depression, crying easily, sleeping a lot, and withdrawal. (AR 379). Dr. Miller observed that Banks's mood was depressed and his affect tearful. (AR 380). He was a poor historian; he recalled just one of three items after five minutes and incorrectly answered two of three calculation problems. (AR 380). He completed serial sevens from 100, making four errors. (AR 380). Dr. Miller assessed that Banks's daily routines did not appear well established and that he needed support from others to accomplish his tasks. (AR 380). Dr. Miller opined that although Banks's daily activities appeared simple, his ability to sustain these efforts on a daily basis appeared impaired. (AR 380). Dr. Miller diagnosed Banks with an adjustment disorder with mixed anxiety and depressed mood, post traumatic stress disorder ("PTSD"), and borderline intellectual functioning, and assigned him a Global Assessment of Functioning ("GAF") score of 58.[4] (AR 381).

In April 2013, F. Kladder, Ph.D., a state agency psychologist, reviewed Banks's record. Dr. Kladder concluded that Banks could perform simple, unskilled tasks on a sustained basis without special considerations. (AR 97-98). Dr. Kladder's assessment was affirmed by another state agency psychologist, William Shipley, Ph.D, two months later. (AR 124-26; *see also* AR 134).

In May 2013, J. Sands, M.D., a state agency physician, reviewed Banks's record and concluded that he could lift 10 pounds frequently and 20 pounds occasionally; sit for six hours in

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, Dr. Miller used a GAF score in assessing Banks, so it is relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

an eight-hour workday; stand or walk for six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but never climb ladders, ropes, or scaffolds; and must avoid even moderate exposure to wetness and all exposure to hazards. (AR 122-23).

Almost a year later, in March 2014, Banks visited the emergency room for pain and swelling in his left leg and ankle. (AR 391, 404). Banks had pain, swelling, and tenderness on the lateral aspect of his left lower extremity and there was an area with drainage from one wound. (AR 404-05). An examination revealed that Banks had joint swelling, arthralgias, and a gait problem. (AR 405). X-rays showed degenerative changes to the left ankle and hindfoot, subchondral sclerotic appearance of the proximal tibiofibular articulation, post-surgical changes of the distal fibula and ankle, with focal soft tissue swelling in the lateral soft tissues adjacent to the distal fibular as well as the anterior lateral shin, and a lucency adjacent to the proximal screws of the fixation plate, possibly representing loosening of the hardware in his left lower extremity. (AR 406-08). Banks was diagnosed with left leg pain and complication of surgical procedure and was prescribed antibiotics and pain medication. (AR 391).

In April 2014, Banks saw a physician's assistant at Ortho Northeast for a reevaluation of his left leg and ankle pain. (AR 392). He had no insurance at the time. (AR 392). Banks reported that a pinpoint wound at the bottom of his skin graft site had some yellow drainage on and off for about three years; he was using a cane. (AR 410-11). Decreased motion and joint pain was noted on examination, with hypersensitivity over the graft sites and mild ankle arthritis. (AR 411). The physician's assistant ordered a laboratory work-up and instructed Banks to be weight-bearing as tolerated; she also discussed possible removal of his hardware, but

emphasized that there was no guarantee it would relieve his pain. (AR 392). Banks was to keep an eye on the drainage and finish the antibiotic he was given in the emergency room. (AR 392).

### III. ANALYSIS

*A. The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

(citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On August 29, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 12-26). The ALJ concluded at step one of the five-step analysis that although Banks had worked after his alleged onset date at what appeared to be at the substantial gainful activity level, this work constituted an unsuccessful work attempt. (AR 14-15). At step two, the ALJ found that Banks had the following severe impairments: status/post ORIF left fibula fracture, history of soft tissue injury to left ankle, subtalar and ankle joint arthrosis, adjustment disorder with mixed anxiety and depressed mood, PTSD, and borderline intellectual functioning. (AR 15).

At step three, the ALJ concluded that Banks did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 15-17). Before proceeding to step four, the ALJ determined that Banks's symptom testimony was not fully credible to the extent that it was inconsistent with the following residual functional capacity ("RFC"):

> [T]he claimant has the [RFC] to perform sedentary work . . . with the following: He can lift/carry and push/pull up to 10 pounds; stand or walk for approximately 2 hours per 8-hour workday; and sit for approximately 6 hours per 8-hour workday, with normal breaks. He is limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; and never climbing ladders, ropes or scaffolds. He should avoid even moderate exposure to wetness and all exposure to hazards of slick, uneven surfaces and unprotected heights. He is unable to engage in complex or detailed tasks, but can perform simple, routine and

12

> repetitive tasks consistent with unskilled work and is able to
> sustain and attend to task throughout the eight-hour workday.

(AR 17).

Based on this RFC and the VE's testimony, the Commissioner concluded at step four that Banks was unable to perform any of his past relevant work. (AR 24). At step five, however, the Commissioner found that there were a significant number of jobs in the economy that Banks could perform, including sorter, assembler, and final assembler. (AR 25). Accordingly, Banks's applications for DIB and SSI were denied. (AR 25-26).

### C. The ALJ Failed to Adequately Develop the Record Concerning Banks's Literacy

Banks argues that the ALJ erred by failing to develop the record and minimally articulate her findings concerning his intellectual abilities.[6] The Court agrees that the ALJ failed to carry her burden at step five with respect to Banks's literacy, necessitating a remand of the Commissioner's final decision.

In evaluating a claimant's educational level, the Commissioner uses the following categories:

> (1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.
>
> (2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.
>
> (3) Limited education. Limited education means ability in reasoning, arithmetic,

---

[6] The Commissioner's response brief does not specifically address Banks's argument concerning his literacy level, and instead generally argues that a claimant "has the burden of providing that his impairments were of disabling severity and caused specific restrictions." (*See* DE 20 at 11).

and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

(4) High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work.

20 C.F.R. §§ 404.1564(b), 416.964(b). The numerical grade level that the claimant completed in school may not always represent a claimant's actual educational abilities—these may be higher or lower. 20 C.F.R. §§ 404.1564(b), 416.964(b); *see Carbaugh v. Colvin*, No. 14 C 7431, 2016 WL 792299, at *4 (N.D. Ill. Mar. 1, 2016) ("[T]he fact and amount of formal schooling does not decisively foreclose a finding of illiteracy." (quoting *Cole v. Apfel*, No. 98 C 6735, 2000 WL 290432, at *3 (N.D. Ill. Mar. 17, 2000))). However, if there is no other evidence to contradict the numerical grade level, an ALJ will use the grade level to determine a claimant's educational abilities. 20 C.F.R. §§ 404.1564(b), 416.965(b); *see Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 557, 450 (7th Cir. 1990); *Holliday v. Schweiker*, 563 F. Supp. 1272, 1279 (N.D. Ill. 1983) ("At most, one's numerical grade level gives rise to a rebuttable presumption of basic literacy.").

An ALJ must minimally articulate her finding concerning a claimant's educational level and build an accurate and logical bridge between the evidence and her conclusion. In that regard, "[w]hen reasonable minds can disagree as to the ALJ's conclusion . . . , the ALJ's decision should be affirmed unless the reasoning is 'so poorly articulated as to prevent meaningful review.'" *Truckey v. Astrue*, No. 2:10 cv 447, 2011 WL 5101883, at *7 (N.D. Ind. Oct. 27, 2011) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)) (finding that the

ALJ's conclusory statement that the claimant had a "limited education," without more, was not enough to support the decision that the claimant was not disabled).

Here, the record contains some evidence of both literacy and illiteracy, leading reasonable minds to disagree about whether Banks was either illiterate or had a limited or less education. On the one hand, suggesting that Banks may be illiterate, he was enrolled in special education classes in school; he testified that he could not read a newspaper or a grocery list; he testified that he could not write anything other than his name; he represented in his adult function report that he could not follow written instructions because he "can't read & understand what is asked" (DE 306); and he testified that a friend completed his application for him. (AR 43). On the other hand—and supporting a literacy finding—Banks attended school through the tenth grade; he testified that he could read "small words"; he signed his application as if he had completed it himself; his friend represented on the third party adult function report that Banks's interests include "reading about sports" and reading the Bible and that he has no problems following written instructions (AR 290-91); Banks's work history includes several semi-skilled positions (AR 24, 80-82); and Banks indicated in his disability report that he could read and understand English and could write more than just his name in English (AR 261).

Faced with this conflicting evidence, the ALJ had to make a decision regarding Banks's literacy.[7] As explained earlier, "[w]hen reasonable minds can disagree as to the ALJ's conclusion, as is the case here, the ALJ's decision should be affirmed unless the reasoning is 'so poorly articulated as to prevent meaningful review.'" *Truckey*, 2011 WL 5101883, at *7 (quoting *Steele*, 290 F.3d at 940). Here, the ALJ simply pronounced in her decision that Banks

---

[7] No medical source of record specifically opined about Banks's ability to read and write.

15

had a "limited education" (AR 24), never addressing Banks's testimony that he could not read a newspaper or a grocery list and or write anything other than his name. However, as explained earlier, the Commissioner considers a person illiterate "if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." 20 C.F.R. §§ 404.1564(b), 416.964(b).

On the record presented, "the gap between concluding [that Banks] was illiterate or that he had a limited [or less] education required a logical bridge to traverse." *Truckey*, 2011 WL 5101883, at *7. "Without such a bridge, this [C]ourt is unable to provide a meaningful review of the ALJ's decision without re-weighing evidence or substituting its own reasoning or judgment." *Id.* (citing *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000)). The ALJ in this instance failed to provide such a bridge, as she never explained why Banks fell into the "limited education" category rather than the "illiterate" category. *See id.* (remanding the case where the record contained evidence of both illiteracy and literacy but the ALJ merely concluded that the claimant had a limited education without offering any explanation); *Schimpf v. Astrue*, 780 F. Supp. 2d 798, 802-03 (S.D. Ind. 2011) (remanding because the ALJ failed to articulate any reason why the claimant fell into the limited education category rather than the illiterate category).

Given the ALJ's conclusion that Banks was unable to perform his past work, the Commissioner bore the burden at step five of showing that Banks retains the capacity to perform a significant number of jobs in the economy. *See Clifford*, 227 F.3d at 868 (explaining that the claimant bears the burden at steps one through four, but the Commissioner bears the burden at step five); *Jones v. Astrue*, No. 08-6016, 2009 WL 485395, at *2 (W.D. Ark. Feb. 26, 2009) (stating that the Commissioner bore the burden at step five of proving that the claimant's reading

level was sufficient to perform the jobs identified by the VE); *Holliday*, 563 F. Supp. at 1281 (same). More succinctly stated, "[i]t is the Commissioner's burden of establishing that [Banks] is literate, and it has not done so here." *Mendoza v. Colvin*, No. 1:15-cv-777-GSA, 2016 WL 6441603, at *6 (E.D. Ca. Oct. 31, 2016) (citing *Silviera v. Apfel*, 204 F.3d 1257, 1261 (9th Cir. 2000)).

The literacy issue matters because the jobs identified by the VE require a higher reading level than the level to which Banks testified at the hearing. A review of the *Dictionary of Occupational Titles* ("DOT") reveals that all three jobs identified by the VE—sorter, assembler, and final assembler—require the ability to: (1) "[r]ecognize the meaning of 2,500 (two- or three-syllable) words"; (2) "[r]ead at the rate of 95-120 words per minute"; and (3) "[p]rint simple sentences containing subject, verb, and object, and series of numbers, names, and addresses." *See DOT* 521.687-086, 1991 WL 674226 (4th ed. 1991); *DOT* 706.684-030, 1991 WL 679052 (4th ed. 1991); *DOT* 713.687-018, 1991 WL 679271 (4th ed. 1991); *see, e.g.*, *Jones*, 2009 WL 485395, at *2 (remanding case where the VE did not testify that a person with a first-grade reading level could perform work as a housekeeper, which required the ability to recognize 2,500 words, read at a rate of 95-120 words per minute, etc.).

Ultimately, it may be that Banks is able to read enough to perform the jobs identified by the VE. However, on this record, it is far from clear because the VE never addressed the effect Banks's literacy would have on his ability to perform the identified jobs. (AR 82); *see Carbaugh*, 2016 WL 792299, at *5 ("In the Seventh Circuit, the *Dictionary of Occupational Titles*['] presumption that an illiterate person can hold no job may be overcome with appropriate VE testimony." (citing *Donahue v. Barnhart*, 279 F.3d 441, 444-47 (7th Cir. 2002)).

Consequently, this case will be remanded "so that the Commissioner may meet her burden of proving that there exist jobs in the economy that [Banks] can perform." *Carbaugh*, 2016 WL 792299, at *5; *see Cole*, 2000 WL 290432, at *4 ("Even though the 'standard for literacy has been pitched quite low, not enough evidence has been presented in this case to ascertain whether [the claimant] surpasses this threshold." (quoting *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 389 (7th Cir. 1987))); *D'Augustino v. Colvin*, No. 15-CV-6083, 2016 WL 5081321, at *4 (W.D.N.Y. Sept. 16, 2016) (collecting cases) (remanding case where the ALJ failed to adequately develop the record concerning the possibility that the claimant was functionally illiterate); *Mendoza*, 2016 WL 6441603, at *6 (remanding case so that the Commissioner could assess the claimant's literacy); *Graham v. Colvin*, No. 12-2325, 2014 WL 721950, at *3 (W.D. Ark. Feb. 26, 2014) (remanding case for development of the record, including standardized testing, as to the claimant's literacy); *O'Neel v. Colvin*, No. CV-11-0368-WFN, 2013 WL 1774674, at *3 (E.D. Wash. Apr. 25, 2013) (remanding case for development of the record as to the claimant's literacy); *Truckey*, 2011 WL 5101883, at *8 (remanding case where the ALJ failed to provide any grounds upon which his literacy determination could be evaluated). This may require additional findings of fact as to Banks's actual level of reading ability, a consultative examination and standardized testing, and more precise VE testimony as to the educational demands of the identified jobs.[8] *See Carbaugh*, 2016 WL 792299, at *4 ("Where a claimant has raised an issue of potential illiteracy, the ALJ has an obligation to develop the record to determine the claimant's literacy level." (citation omitted)).

---

[8] Because the case will be remanded for further development of the record as to Banks's literacy, the Court need not reach Banks's remaining arguments.

## IV.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of Banks and against the Commissioner.

SO ORDERED.

Entered this 28th day of March 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge